UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Cassidy Jared Loch and Saara Loch,

       Plaintiffs,

v.                                                                                                  Civil No. 10-2153 (JNE/FLN)
                                                                                                ORDER

City of Litchfield and Litchfield Police
Officer Travis Rueckert,

       Defendants.

---

Michael A. Bryant, Esq., Bradshaw & Bryant, PLLC, appeared for Plaintiffs.

Jon K. Iverson, Esq., and Stephanie A. Angolkar, Esq., Iverson Reuvers, LLC, appeared for Defendants.

---

On March 15, 2009, Litchfield Police Officer Travis Rueckert shot and injured Cassidy Loch during a 911 response at the Loch residence. Plaintiffs seek redress for alleged constitutional violations under 42 U.S.C. § 1983 and by state common law claims. Citing qualified, official, and statutory immunities, Defendants moved for summary judgment. The Court concludes that Officer Rueckert is protected by qualified and official immunities and that the City of Litchfield is not liable to Plaintiffs vicariously or by its own acts. Defendants' summary judgment motion is granted as to all claims.

## I.     BACKGROUND[1]

### A.     Events leading up to the arrival of Officer Rueckert

Cassidy and Saara Loch, husband and wife, attended a party on Saturday, March 14, 2009. Around 10:00 p.m. or 10:30 p.m., Saara Loch (Saara) left the party, receiving a ride home from a friend. As agreed upon by the Lochs, Saara returned to the party with her brother, Seth

---

[1]     Unless otherwise stated, the facts described below are undisputed or are those that a reasonable fact-finder could find when viewing the record in the light most favorable to Plaintiffs. *See Gosney v. Reliable Life Ins. Co.*, 293 F.3d 1052, 1053 (8th Cir. 2002).

Rokala, to pick up Cassidy Loch (Cassidy) at 1:00 a.m. Cassidy, not wanting to depart, argued with Saara. The argument escalated when Rokala tried to take Cassidy's keys in an attempt to prevent him from driving while intoxicated. Despite these efforts, Cassidy left the party, intoxicated and driving his truck. Rokala and Saara trailed him in another car. Cassidy arrived at the Loch residence first and parked in the driveway. Rokala and Saara parked behind Cassidy's truck in an attempt to block him from leaving.

After he parked the truck, Cassidy immediately went inside and upstairs to the couple's bedroom. He retrieved a handgun, returned to the truck, and tried to leave. He backed the truck into Saara's car, and then drove across the front lawn toward the street. His truck got stuck in a snow bank with the driver's side door wedged against a tree.

Gail Loch (Gail), Cassidy's mother, arrived at the residence after being summoned by Saara. Saara, Gail, and Rokala approached Cassidy, who was still in his truck, and tried to calm him down and convince him not to drive. Cassidy pulled out his handgun, pointed it at his chin, and asked, "Is this what you want me to do?" Gail instructed Seth Rokala's wife, Elizabeth Rokala, who was watching the events from the doorway of the house, to call 911. Elizabeth, unaware of the gun at the time she placed the call, reported to the 911 dispatcher that her brother-in-law was intoxicated and attempting to drive.

**B.     Officer Rueckert's actions at the Loch residence**

Officer Rueckert responded to the 911 call. Upon arriving at the Loch residence, he found several members of the Loch family in the front yard. Rueckert parked partially in the street with his squad car angled toward the disabled truck and exited his police vehicle. He turned on his emergency lights but did not move the light switch far enough to activate the squad car's video recording camera. Rueckert began approaching the group standing near the truck. Rokala yelled

"he has a gun." In response, Rueckert drew his service weapon and sought cover behind the engine block of his vehicle. From that position, he called the dispatcher and reported that someone at the scene had a gun.

Rueckert watched from behind his squad car as Cassidy, who was unable to open the driver's side door because it was wedged against a tree, kicked the glass out of the window. Cassidy threw a gun out of the broken window into a snow bank. Rueckert, still crouched behind the squad car, testified that he did not see the gun thrown. Cassidy climbed feet first through the broken window and out of the truck. He then began arguing "nose-to-nose" with Rokala. At that point, Cassidy's hands were at his side and his back was to Rueckert. Fearing for Rokala's safety, Rueckert pointed his weapon at Cassidy and ordered everyone to the ground.

On Rueckert's command, everyone in the yard got on the ground except Cassidy. Cassidy turned around and began moving toward Rueckert. The witnesses' accounts differ as to Cassidy's demeanor and the speed at which he approached Rueckert, but they all agree that rather than lying down on the ground, he moved toward the police officer. Rueckert backed away from Cassidy and into the street. With his gun still pointed at Cassidy, Rueckert continued to order him to the ground. Saara and Gail yelled that Cassidy was unarmed, but Rueckert claims he did not hear them.

As Cassidy walked down a snow bank toward Rueckert, who was on the street level, he slipped. As he slipped his body turned sideways so that Rueckert could not see Cassidy's right hand. Around the time he slipped, Cassidy made a statement to Rueckert that contained the word "kill." Rueckert did not comprehend the complete statement, but heard the word "kill." Rueckert saw something black—it was ultimately determined to be a cell phone holder—on Cassidy's hip. While Cassidy was righting himself from the slip, Rueckert saw him move his right arm toward

3

the black bulge on his hip. Rueckert began firing at Cassidy while continuing to back away. Rueckert fired eleven rounds, eight of which hit Cassidy. Cassidy fell to the ground after the second shot. Rueckert kept his gun trained on Cassidy while he called for backup and reported "shots fired, one down." Upon receiving this radio transmission, the dispatcher immediately called for backup and put an ambulance on standby.

**C.     The Aftermath**

Rueckert stood with his gun trained on Cassidy until backup arrived. Litchfield Chief of Police Patrick Fank was the first to arrive. Rueckert immediately informed Fank that the scene was not secure, that he did not have the gun, and that there may be a gun near the truck. More backup arrived, and police secured the scene by, among other things, handcuffing the bystanders. The police searched Cassidy, focusing first on the black item on his hip which was then discovered to be a cell phone holder. With Rokala's assistance, police located a .45 caliber semi-automatic handgun in the snow near the driver's side of Cassidy's truck. Fank's squad car video captured a conversation between Rueckert and Fank. Fank asked Rueckert how he was doing, and Rueckert expressed his dismay at failing to capture the events on video. Fank responded, "[d]on't start second-guessing yourself." About twenty minutes after the shooting, an ambulance transported Cassidy to the hospital.

**II.     DISCUSSION**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce

4

admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.      42 U.S.C. § 1983 claim against Officer Rueckert**

Plaintiffs assert § 1983 claims against Rueckert in his individual and official capacities.[2] 42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983. Because § 1983 is "not itself a source of substantive rights," a court addressing a claim pursuant to § 1983 must "identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Plaintiffs allege a violation of the Fourth Amendment right to be free from unreasonable seizures.

Rueckert claims his actions are protected under qualified immunity. "Under the doctrine of qualified immunity, state actors are protected from civil liability when 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sexton v. Martin*, 210 F.3d 905, 909 (8th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To overcome the defense of qualified immunity the plaintiff must show: '(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate

---

[2]      "A suit against a public employee in his or her official capacity is merely a suit against the public employer." *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir.1999) (citation omitted). The City of Litchfield cannot be held liable under § 1983 on a *respondeat superior* theory. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). Plaintiffs' claim against the City of Litchfield is discussed infra.

5

the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.'" *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (quoting *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009)).

### 1. *Deprivation of a constitutional right*

Cassidy alleges Rueckert violated his right to be free from unreasonable seizure under the Fourth Amendment. "'To establish a violation of the Fourth Amendment in a section 1983 action, the claimant must demonstrate a seizure occurred and the seizure was unreasonable.'" *Moore v. Indehar*, 514 F.3d 756, 759 (8th Cir. 2008) (quoting *McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir. 2003)). "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). The appropriate reasonableness analysis asks whether the "officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989); *see also Ngo v. Storlie*, 495 F.3d 597, 602 (8th Cir. 2007) (framing the inquiry as "whether the amount of force used was objectively reasonable under the particular circumstances"). The Court turns to the question of whether, taking the facts in the light most favorable to Plaintiffs, Cassidy was subjected to an unreasonable seizure.

"Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Garner*, 471 U.S. at 11. "A reasonable but mistaken belief that probable cause exists for using deadly force is not actionable under § 1983." *Carr v. Tatangelo*, 338 F.3d 1259, 1269 (11th Cir. 2003). "'The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Cook v. City of Bella Villa*, 582 F.3d 840, 851 (8th Cir. 2009) (quoting

*Graham*, 490 U.S. at 396). It is an objective test that allows "'for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" *Id.* (quoting *Graham*, 490 U.S. at 397). Defendants contend that there are no material issues of fact, and that Rueckert's use of deadly force was justified by an objectively reasonable belief that Cassidy posed a threat of serious physical harm to him or one of the other bystanders.

In evaluating whether a police officer's use of deadly force is justified, it is relevant to know whether the officer believed that the target of the force was armed. *See, e.g*, *Carr*, 338 F.3d at 1262-66 (responding with deadly force was reasonable after hearing what was perceived as the sound of a bullet being chambered); *Anderson v. Russell*, 247 F.3d 125, 130 (4th Cir. 2001) ("[T]he evidence conclusively establishes that [Defendant] reasonably perceived [Plaintiff] to be armed with a gun. . . . based upon a citizen's report that was later corroborated by [Defendant's] own observation of a bulge near [Plaintiff's] waistband."). Here, it is a cornerstone of Plaintiffs' excessive force claim that Rueckert had actual knowledge that Cassidy was unarmed. The Court turns now to the state of the record on that point.

Plaintiffs direct the Court to deposition testimony of Gail and Saara in which they testify that they shouted from the yard to Rueckert that "he", meaning Cassidy, did not have a gun. Rueckert, as has been noted, testified that he did not hear them. For present purposes, the Court accepts Plaintiffs' version of the facts: Gail and Saara did shout, and Rueckert did hear them. But hearing a statement that a person is not armed does not conclusively resolve the question. Rueckert could not have known the truth of the statements. He had just been told, by Rokala, that Cassidy *did* have a gun. Rueckert could not have known the truth of that statement, either. But a reasonable officer in Rueckert's position would be on alert that Cassidy could possibly be armed.

7

Plaintiffs also direct the Court to a statement made by Rueckert to Chief Fank when Fank first arrived at the scene: that there might be a gun near the truck. Plaintiffs assert that this proves that Rueckert must have actually seen Cassidy throw the gun out of the vehicle window. Nothing in the surrounding circumstances is offered in support of Plaintiffs' proffered conclusion. For example, the record indicates the witnesses were shouting—though the record is incomplete as to the content of those shouts—during the interval after the shooting and before Fank arrived. And Rueckert did not know for certain that the bulge on Cassidy's hip was as gun; if Cassidy had been armed when Rokala said he was, then the area surrounding the truck would be a natural place to begin looking for a weapon. Accepting, though, for present purposes, the inference urged by Plaintiffs: that Rueckert did see Cassidy throw something—perhaps even a gun—the matter is not closed. A police officer might reasonably be concerned, even after a person throws a gun, that the person could still be armed. Without more, the leap from Rueckert's statement to Fank to the conclusion that Rueckert had actual knowledge that Cassidy had no gun is based on speculation. *See Putman v. Unity Health System*, 348 F.3d 732, 733-34 (8th Cir. 1995) (requiring the nonmoving party to base its allegations on more than mere speculation or conjecture).

Plaintiffs also urge a third item of evidence in this regard: A conversation between Rueckert and Fank, after the gun was located, that was video recorded. Plaintiffs point to Fank's statement to Rueckert, "don't start second-guessing yourself." But here Plaintiffs take liberties with the context. The video tape actually shows Fank making that statement in response to Rueckert's expression of regret at not having captured the incident on video.

Taking the facts in the light most favorable to the Plaintiffs, Rueckert had reason to suspect that Cassidy might not be armed. But similarly, the only reasonable conclusion from

8

these facts is that Rueckert had reason to suspect that, as Cassidy approached him, he might have been armed.

Cassidy aggravated the tense situation by failing to follow Rueckert's order to get on the ground. Taking the facts in the light most favorable to the Plaintiffs, Cassidy had his hands up as he approached Rueckert. It is undisputed, though, that Cassidy did not follow the order—repeatedly given by Rueckert—to get down on the ground. Saara and Gail Loch surmise that Cassidy was approaching Rueckert to turn himself in. But nothing supports the inference that that was the only conclusion a reasonable officer in Rueckert's position could have drawn. In fact, another of Cassidy's family members, Seth Rokala, did not think Cassidy was trying to turn himself in. Rokala initially told investigating officers that he thought Cassidy was trying to get Rueckert to shoot him in what he referred to as a "suicide by cop." Except insofar as it might have manifested itself to an observer, Cassidy's state of mind is immaterial. Nothing in the record reflects that Gail or Saara base their opinions on an objective manifestation other than perhaps Cassidy's extended hands during part of his approach toward Rueckert. Neither is the notion that Cassidy was attempting "suicide by cop" based on anything that could have been seen by Rueckert. Rokala had seen Cassidy hold a gun to his own chin and ask, "Is this what you want me to do?" But that occurred before Rueckert was on the scene. The undisputed fact is that rather than getting to the ground as ordered, Cassidy approached Rueckert. An officer reasonably perceives a heightened risk of serious physical harm when a suspect disobeys the officer's orders. *See, e.g.*, *Billingsley v. City of Omaha*, 277 F.3d 990, 993-94 (8th Cir. 2002) (failing to halt after being ordered to stop multiple times); *Anderson*, 247 F.3d at 130 (lowering his hands in disobedience of an officer's order).

Adding to the perceived danger, not only to Rueckert but the bystanders as well, is the fact that Cassidy was intoxicated and agitated. Rueckert knew from the 911 call that he was responding to an intoxicated subject. He observed Cassidy kick out the window of his truck, climb through the window, and get in a heated argument with Rokala. After all of that, Cassidy disregarded the police order to get on the ground, and as he approached Rueckert, he said something that—in Rueckert's uncontroverted testimony—contained the word "kill."

In the moment before he shot, Rueckert saw Cassidy move his hand toward a black bulge on his hip. Plaintiffs do not contest that Rueckert saw a black bulge on Cassidy's right hip. Indeed, after the shooting, a cellphone holder was found on Cassidy's belt. It is also undisputed that Rueckert saw Cassidy move his hand toward that bulge. The Court draws the inference in favor of Plaintiffs that Cassidy's hand movement was in the context of his slip down the snow bank.[3] It was not until Rueckert saw Cassidy move his arm toward the black bulge that he used deadly force. An officer does not have to wait until a weapon is pointed at him to use deadly force as a protective measure. *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001). The visible presence of an item that appears consistent with a weapon and an inability to see a suspect's hands, are relevant to the reasonableness of a police officer's use of deadly force. *See, e.g.*, *Billingsley*, 277 F.3d at 995 (shooting a fleeing suspect was reasonable in part because the officer could not see the suspect's right hand); *Thompson*, 257 F.3d at 898 (firing at a suspect who looked over his shoulder and reached for his waistband during a foot chase was justified); *Krueger v. Fuhr*, 991 F.2d 435, 437 (8th Cir. 1993) (observing the suspect reach for his right hip and hearing the sound of an object being removed while in pursuit contributed to the reasonableness of using deadly force); *Reese v. Anderson*, 926 F.2d 494, 495 (5th Cir. 1991)

---

[3] Rueckert testified that Cassidy regained his balance after slipping and kept coming toward Rueckert before making the movement toward the black bulge. The Court accepts the Plaintiffs' account for the purpose of this motion.

(moving his hands out of sight after a high-speed vehicle chase added to the officers probable cause for firing). The pivotal material fact—that Cassidy moved his arm toward the black bulge on his hip—is undisputed.

Plaintiffs argue that because Cassidy fell to the ground after the second shot, Rueckert used excessive force in shooting additional rounds because the threat had already been eliminated. If the decision to use deadly force was reasonable, firing multiple rounds in rapid succession does not change the reasonableness of that decision. Rueckert fired eleven rounds over the course of only a few seconds. His determination of when the threat was subdued is exactly the kind of split-second decision that the Court should not, in hindsight, second guess. *See Graham*, 490 U.S. at 396-97.

For the reasons discussed, Officer Rueckert had probable cause to believe he was in immediate danger. He acted in an objectively reasonable way by using deadly force. Thus, Rueckert's conduct did not violate Cassidy's constitutional right.

### 2. *Clearly established right at the time of deprivation*

Even if the Court had not found that Rueckert's actions were within the bounds of constitutionally permissible force, it would conclude that he is entitled to qualified immunity. In the second part of the analysis the Court must determine whether the right at issue is clearly established. *Howard*, 570 F.3d at 991. "'The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person.'" *Crumley v. City of St. Paul*, 324 F.3d 1003, 1007 (8th Cir. 2003) (quoting *Guite v. Wright*, 147 F.3d 747, 750 (8th Cir. 1998)).

The qualified immunity defense protects officers as the rule rather than the exception. *See Moore v. City of Desloge*, 647 F.3d 841, 846 (8th Cir. 2011) ("[O]fficials performing

discretionary functions generally are shielded from liability for civil damages. . . ." (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))). "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). The purpose of qualified immunity is to protect officers acting in the "hazy border between excessive and acceptable force." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). If the propriety of Rueckert's use of deadly force is not clear, it is at least "hazy." The state of the law, presumably known to a reasonable police officer in Rueckert's position, is that deadly force is appropriate where the officer reasonably believes death or serious bodily harm is imminent. *See, e.g.*, *Garner*, 471 U.S. at 11; *Moore*, 514 F.3d at 762; *Nelson v. County of Wright*, 162 F.3d 986, 990 (8th Cir. 1998). A reasonable officer would not have known Rueckert's decision to use deadly force violated the Fourth Amendment. Rueckert, acting in response to an emergency call and in his official capacity, faced an agitated and possibly armed suspect who approached him in disobedience of his orders and moved toward a black bulge on his hip. Under these circumstances, he is shielded from suit by the doctrine of qualified immunity.

**B.      42 U.S.C. § 1983 claim against the City of Litchfield**

Even if Cassidy had suffered a constitutional deprivation, the City of Litchfield would not be liable unless it had a policy or custom that was the "moving force of the constitutional violation." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). Litchfield may be liable for deficient policies regarding hiring and training police officers where "(1) the city's hiring and training practices are inadequate; (2) the city was deliberately indifferent to the rights of others in adopting them, such that the 'failure to train reflects a deliberate or conscious choice by a municipality,' *City of Canton v. Harris*, 489 U.S. 378, 389 (1989); and (3) an alleged deficiency

in the city's hiring or training procedures actually caused the plaintiff's injury." *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996); *see also Liebe v. Norton*, 157 F.3d 574, 579 (8th Cir. 1998) (stating that failure to supervise claims are governed by the same "deliberate indifference standard" as failure to train claims).

Plaintiffs allege that (1) Rueckert was a poor marksman, (2) he misapplied his training on cover and concealment, (3) Litchfield did not require training on "suicide by cop," and (4) Litchfield did not train Rueckert to handle stressful situations. Plaintiffs do not, however, connect the first three alleged failings to Cassidy's injury, thereby failing the causation element. *See Andrews*, 98 F.3d at 1076. For example, Litchfield's firearms instructor testified that it took Rueckert more tries than other officers to pass the Department's marksmanship tests. If he had shot Cassidy by accident, that could be relevant (although having the lowest scores in a group does not equate to incompetence). But no one asserts that he fired with any purpose but to hit Cassidy, and he did. Similarly, Plaintiffs do not explain how "proper" training on cover and concealment would have affected the events at the Loch residence. Plaintiffs do not point to any evidence of how proper training on cover and concealment should affect police behavior when, as here, bystanders may be at risk. "Suicide by cop" training is offered, but not required, by Litchfield. The record allows nothing but guesswork about how an officer who had taken the training might have responded differently than Rueckert.

Finally, Plaintiffs allege Rueckert was not adequately trained to handle stressful situations. But Plaintiffs do not offer proof that the City's training on handling stressful situations was "deliberately indifferent to the rights of others." *Id.* Plaintiffs' proffered evidence centers on Rueckert's failure to hear Gail and Saara yelling that Cassidy was not armed, and his failure to comprehend all of what Cassidy was saying as he approached the officer. Plaintiffs

13

argue that these failures of perception indicate that when the stress increased, Rueckert's situational awareness waned. They imply that with better training on stress management, Rueckert would have perceived and processed all that was occurring at the scene. The argument is without record support—expert or otherwise—but even if true, it does not show deliberate indifference on the part of Litchfield. *See Thelma D. v. Bd. of Educ.*, 934 F.2d 929, 935 (8th Cir.1991) ("[T]he fact that 'a particular [employee] may be unsatisfactorily trained will not alone suffice to fasten liability on the [municipal entity].'" (quoting *City of Canton*, 489 U.S. at 390-91)). Plaintiffs do not point to any fact in the record indicating that the City made a "deliberate or conscious choice" to ignore or avoid teaching its officers to cope with stressful situations. *City of Canton*, 489 U.S. at 389.

Reading the record in the light most favorable to Plaintiffs, there are not sufficient facts to prove a deficient training program. *See Andrews*, 98 F.3d at 1076. Thus the § 1983 claim against the City of Litchfield is dismissed.

C.      **State law tort claims against Officer Rueckert**

Plaintiffs assert state law claims for assault, battery, and intentional infliction of emotional distress against Rueckert over which the Court exercises supplemental jurisdiction. Rueckert argues that his actions are protected under Minnesota's doctrine of official immunity. Official immunity provides law enforcement officers with a defense from state law tort claims if (1) the alleged actions of the officer are discretionary, and (2) the alleged acts were not malicious or willful. *Dokman v. Cnty. of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001). Willful and malicious are synonymous and defined as "the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right." *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991) (quoting *Carnes v. St. Paul Union Stockyards Co.*, 205 N.W. 630, 631 (Minn. 1925)). "Malice in the context of official immunity means intentionally

committing an act that the official has reason to believe is legally prohibited." *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 663 (Minn. 1999).  The Court notes that Minnesota uses a subjective test for official immunity in contrast to the objective test for qualified immunity under federal law. *Wertish v. Krueger*, 433 F.3d 1062, 1068 (8th Cir. 2006).

Decisions made by police officers responding to a call are discretionary in nature, including the decision to use deadly force. *Maras v. City of Brainerd*, 502 N.W.2d 69, 77 (Minn. Ct. App. 1993); *see also Kelly*, 598 N.W.2d at 664-65. As discussed above, Plaintiffs have not shown that Rueckert knew that using deadly force in response to Cassidy's actions was illegal and that he intentionally shot Cassidy despite this knowledge. Viewing the facts in the light most favorable to the Plaintiffs, no reasonable jury could find that Rueckert acted with malicious intent.

Plaintiffs also argue that because Rueckert did not immediately render first aid to Cassidy or inquire as to his condition after he was evacuated, this demonstrates malice. Rueckert radioed "shots fired, one down" immediately. The dispatcher placed the ambulance on standby, and Cassidy was treated as soon as police had located the gun and secured the scene for the paramedics. In the time between the shooting and the arrival of the paramedics, Rueckert, along with the other responding officers, was securing the scene by attaining control of the bystanders and locating the gun. Plaintiffs do not offer any evidence to show that Rueckert intentionally withheld medical treatment from Cassidy. Thus, Rueckert is entitled to the defense of official immunity.

**D.    Negligence claim against the City of Litchfield**

"[M]unicipalities are generally liable for the torts of their employees if the tort is committed within the scope of employment." *Schroeder v. St. Louis Cnty.*, 708 N.W.2d 497, 503

(Minn. 2006); *see* Minn. Stat. § 466.02. Statutory immunity is an exception protecting municipalities from "[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." Minn. Stat. § 466.03, subd. 6. Planning level decisions, but not operational level decisions, are protected under statutory immunity. *Conlin v. City of Saint Paul*, 605 N.W.2d 396, 400 (Minn. 2000). In differentiating between the two, the question is "whether the legislature intended to immunize the particular government activity that is the subject of the tort action." *Nusbaum v. Blue Earth Cnty.*, 422 N.W.2d 713, 719 (Minn. 1988) (citing *United States v. Varig Airlines*, 467 U.S. 797, 813 (1984)).

Plaintiffs claim Litchfield was negligent in hiring, training, and supervising Rueckert. Minnesota courts have consistently found employee hiring, training, supervision, and retention to be planning level decisions protected by statutory immunity because they require balancing social, political, and economic considerations. *See, e.g.*, *Fear v. Independent School Dist. 911*, 634 N.W.2d 204, 212 (Minn. Ct. App. 2001); *Maras v. City of Brainerd*, 502 N.W.2d 69, 78 (Minn. Ct. App. 1993). Plaintiffs offer no explanation as to why the Court should deviate from this established precedent. Thus, Litchfield receives statutory immunity on the claims of negligent hiring, training, and supervising.

**E.     Vicarious liability for the City of Litchfield**

Plaintiffs allege the City of Litchfield should be held vicariously liable for the actions of its employee, Officer Rueckert. However, "[v]icarious official immunity protects a governmental entity from liability based on the acts of an employee who is entitled to official immunity." *Dokman*, 637 N.W.2d at 297; *see also Pletan v. Gaines*, 494 N.W.2d 38, 43 (Minn. 1992) (finding official immunity for the municipality where the police officer received official

16

immunity). Because the Court concludes that Officer Rueckert is entitled to official immunity, the City of Litchfield is entitled to vicarious official immunity.

**F.     Loss of consortium claim**

Saara Loch claims loss of consortium for the time Cassidy was hospitalized. A claim for loss of consortium is a derivative claim. *See Peters v. Bodin*, 65 N.W.2d 917, 922 (Minn. 1954). Because Cassidy has not suffered a tort, Saara is not entitled to recover on a claim of loss of consortium.

### III.     CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendants' Motion for Summary Judgment [Docket No. 32] is GRANTED.

2. Counts I-V and the allegations in paragraph 14 of the Complaint are DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  November 17, 2011

s/ Joan N. Ericksen_____
JOAN N. ERICKSEN
United States District Judge
